## Case No. 15,491.
### UNITED STATES v. JONES.
[14 Blatchf. 90.] 2
Circuit Court, S. D. New York. Jan. 10, 1877.
PERJURY—FALSE SWEARING ON APPLICATION FOR NATURALIZATION—EVIDENCE.

On an application to a state court for the naturalization of a foreigner, J. testified, as a wit-

1 [Reported by Hon. William Cranch. Chief Judge.]
2 [Reported by Hon. Samuel Blatchford, Circuit Judge, and here reprinted by permission.]

ness, that he was well acquainted with the applicant. It appeared that he was a total stranger to the applicant, and volunteered as a witness. Held, that this was sufficient evidence to warrant a conviction of J., on an indictment for perjury, under section 5392 of the Revised Statutes.

This was an indictment, under section 5392 of the Revised Statutes, for perjury, in swearing, as a witness, upon an application made to a state court for the naturalization of a foreigner. After conviction, the defendant [George Jones] moved for a new trial, on the ground that there was not sufficient evidence to support the verdict. The evidence showed that the defendant, at the time of an application to the state court for the naturalization of a foreigner, testified before the court, in behalf of the applicant, that he was well acquainted with the applicant, and that the applicant had lived in the United States for five years, and, during that period, had behaved as a man of good moral character. The prosecution showed, by the testimony of the applicant himself, that he had no acquaintance with the defendant, and that the defendant was a total stranger to him. It also appeared, that, at the time the applicant appeared before the court, the defendant was loitering about the door of the court room, having no apparent business there, and that, without any previous request or suggestion from the applicant, he accosted the applicant, and volunteered to be the witness upon his application to the court.

Benjamin B. Foster, Asst. U. S. Dist. Atty.
Abram J. Dittenhoefer, for defendant.

1. A bond was given to J. S., the collector of the district of Petersburg, under the 2d section of the embargo act of the 22d of December, 1807 [2 Stat. 451], and the bond being forfeited, suit was instituted upon it, in the district court, by the collector. Before judgment was obtained, J. S. died, and T. S., his deputy collector, continued in the discharge of the duties of the of-

1 [Reported by John W. Brockenbrough, Esq.]

fice until the 14th of December, 1811. On the 30th of November, 1811, judgment was rendered for the penalty of the bond against one of the co-obligors. On the 26th of November, 1811, J. J. was appointed collector for the same port, but did not qualify until the 14th of December, 1811. The defendant obtained a writ of error to the judgment of the district court. and the judgment of the district court was affirmed in the court above. The amount of the penalty of the bond was then paid into the circuit court. and, thereupon, T. S., executor of J. S., filed his petition, claiming a moiety of the moiety of the amount so paid, which the law directed to be distributed among the revenue officers of the district where the penalty was incurred. There being no naval officer for the district of Petersburg, the only revenue officers were the collector and surveyor. Held: That although J. S. died before judgment, yet as his deputy continued to act as such until after judgment, the rights of J. S. are considered as preserving the same validity as if he had been at that time in life, and discharging the duties of his office. The rights of J. J., his successor, could not accrue until he had qualified as such.

2. The judgment of the district court having been affirmed, the rights of all persons under it continued the same as if the writ of error had never been sued out.

3. The proportion of the penalty given to the collector, belonged to the collector who was in office when the bond was given, and who had prosecuted it to judgment, and not to the collector who happened to be in office when the money was paid

On the 23d of November, 1808, an embargo bond was executed at the custom house of Petersburg, by Thomas Pearse, master of the ship Sally, of Philadelphia, and others, his sureties, to the United States, in the penalty of $46,300, upon the usual conditions, viz., that if the cargo of the said vessel should be relanded in the United States, the danger of the seas excepted, then the obligation to be void. otherwise, to remain in full force. The bond was, in fact, given to John Shore, then collector of the port of Petersburg, in pursuance of the second section of the embargo act of 1807, c. 5 [2 Stat. 451]. No certificate of the relanding of the cargo of the vessel being transmitted to the secretary of the treasury, Shore, in pursuance of instructions from the treasury department, brought suit on the bond, as forfeited. in the district court for the district of Virginia, against George Pegram, Jr., one of the obligors, to recover the penalty. Before judgment was recovered on the bond, John Shore died, viz., on the 30th of October, 1811, and Thomas Shore, who had charge of the office at the time of the death of John Shore, as deputy collector, continued to act as deputy collector until the 14th of December, 1811. After the death of John Shore, and before the 14th of December, 1811. to wit: on the 30th of November, 1811. judgment was rendered in the district court, for the penalty of the bond, against Pegram. [Case unreported.] Pegram obtained a writ of error to the circuit court, from the judgment of the district court. pending which he died, and the writ was revived in the name of his administra-

tor. On the 5th of June, 1813, the judgment of the district court was affirmed. [Case No. 10,906.] Joseph Jones, qualified as collector for the port of Petersburg on the 14th of December, 1811, but his commission bore date the 20th of November preceding, and, consequently, a few days antecedent to the rendition of the judgment in the district court. At the time that the bond was executed, Andrew Forborne was surveyor of the district of Petersburg, for the port of City Point. Forborne died in office, after suit brought, but before judgment, and John H. Peterson qualified as his successor, on the 16th of March, 1811. At the May term of this court, 1814, Pegram's administrator paid into court, the whole amount for which judgment had been rendered against his intestate, whereupon cross petitions were filed by the district attorney, in behalf of the United States, praying the whole sum to be paid to him, or deposited in bank to the credit of the treasurer of the United States: by the present collector and surveyor of the district of Petersburg: and by the representatives of the deceased collector and surveyor, praying a payment over, and distribution of the sum so recovered, according to the rights respectively claimed by them. A bill was also filed on the chancery side of the circuit court. by the representatives of the deceased collector and surveyor, against the present collector and surveyor, and the clerk of the court, praying a moiety to be paid over to them, or such other portion as they were entitled to, by law. Upon the hearing of the cross petitions, the circuit court overruled the prayer of the motion of the district attorney, the court being of opinion, that the United States were entitled only to a moiety of the money, and that the same ought to be paid to the collector of the district on behalf of the United States. Upon the question presented by the bill, and answer in the case of Shore's Executor v. Jones. whether the embargo laws should be interpreted to give the reward to the collector who was in office when the bond was taken, or to the collector officiating when the penalty was paid. the chief justice delivered his opinion.

Before MARSHALL. Circuit Justice, and TUCKER, District Judge.

MARSHALL, Circuit Justice. There are some incidental points in this case, which, though not relied upon. it may be proper to dispose of, in the first instance, for the purpose of simplifying the question. The deputy of John Shore, having continued to act as his deputy, until the judgment was rendered in the district court. the rights of John Shore are considered as preserving the same validity, as if he had been at that time in life, retaining his office and performing its duties. The rights of Joseph Jones, could not commence, until he became the officer. The judgment of the district court,

having been brought into the circuit court, not by appeal, but by writ of error, and having been affirmed, the rights of all the parties under it, remain the same as if the writ of error had never been sued out. The contest, then, in this case is, between the representatives of the person who was collector when the penalty was incurred, and who remained the collector, until the judgment was rendered; and the person who is collector, when the distribution of the penalty is to be made. This question depends in a great degree, on the true construction of the act, "to regulate the collection of duties on imports and tonnage," passed the 2d day of March, 1799 (1 Story's Laws, 573–664, inclusive [1 Stat. 627]), since this penalty is to be distributed according to the rules prescribed in that act. In construing it, the attention of the court has been directed to the phraseology of the 89th section, and it has been contended, very truly, that the word "collector," throughout that section, applies to the collector for the time being, only. Yet, this construction must be sustained, rather by the necessary meaning, than by the grammatical arrangement of the sentence; rather by the life, than by the dead letter of the law. "The collector, within whose district the seizure shall be made," &c. It would seem, if we examine this sentence, without considering the nature of the duty intended to be performed, that the person who commenced the duty, must end it. "The said collector," &c., that is, the collector who instituted the suit, &c. But when we look to this duty, the contrary construction is at once adopted. The duty is entirely official, not in any degree personal, and must be performed by the tenant of the office. But suppose the collector who receives the money, dies before payment and distribution. This duty must necessarily be performed by his executors, not by the collector for the time being. The 91st section distributes the fines, forfeitures, and penalties, imposed by the act. It declares that "one moiety shall be for the use of the United States, and be paid into the treasury thereof, by the collector receiving the same: the other moiety shall be divided between, and paid in equal proportions to, the collector, and naval officer of the district, and surveyor of the port, wherein the same shall have been incurred, or to such of the said officers as there may be in the said district." Were this clause to be construed, without reference to the object of the legislature, it will readily be admitted, that the officer for the time being, and the officer at the moment of distribution, is the person designated by the law. But no legislative act, no instrument of any description, is construed without regard to the object and intent of its framers, as manifested by itself. Language is too imperfect to admit of such a rule. The same words, in different connexion have a different import. The intention,

therefore, must be regarded; and to find that intention, whatever relates to the subject must be inspected.

If the moiety of this penalty be a gratuity to the officer of the district, or a donation to the office, then there is nothing to control that construction, which the words most naturally import. If it be not a gratuity, but a compensation for service, or a stimulus to those who are to perform the service, and on whom the stimulus is to operate, and if such officers will come within the description of the law, they are the persons designated by the law. The attempt to prove that this is not a mere donation to the officers, would be a waste of words and of time. If it be a compensation for services, or a stimulus for the performance of services, it must be bestowed on those who have performed, or who are expected to perform, the services which the law intends to remunerate. Penalties are imposed for the purpose, not of enriching the treasury, but of enforcing the execution of laws, and the legislature, is, therefore, uniformly liberal in its compensation out of penalties, to those who have contributed to the punishment of offenders, and, through that medium, to the enforcement of the law. Any thing like a rateable portion, therefore, of reward to service, is not to be expected; but the kind of service for which the reward is intended, must be looked for and discovered when the reward is claimed by different persons. The same inquiry must be made, if we consider the reward as a stimulus to the officer.

On the part of Mr. Jones, it is contended that, in the view of the legislature, the whole transaction, from its commencement, to its final termination; from the commission of the act, on which the penalty is to accrue, to the receipt of the money, is to be considered as one entire thing, consisting of different parts, deemed equal by the legislature; and that the compensation is bestowed on the person who happens to perform the concluding part of the service, that is, to receive the money, or who is then in office. This construction, which is admitted to be rather favoured by the words of the distributing clause of the section, is said to be equally consistent with the intent and spirit of the law; since the service is equally meritorious with any other that is performed, and since this construction will, equally with any other, stimulate the officer to exertion.

On the part of Mr. Shore, it is contended, that the duties intended to be stimulated and rewarded, terminate with the judgment, if not before, and that the receipt of the money has no connexion with the right to a distributive share of it.

In arguing the merits of the claimants, it has been contended, that no service is to be performed, previous to the judgment, of such importance as to give the officers of that period a superior claim to their successors, or to justify an opinion, that the

legislature intended the reward to stimulate those services, which were to be performed anterior to that period, rather than such as might afterwards become necessary for the collection of the money. In support of this proposition, the argument has been confined to the very case before the court; to an embargo bond. But it is to be recollected, that this is only one of many cases, to which the same principle of distribution applies. The act of 1799, which gives the principle, creates a great number of penalties and forfeitures, and adapts their distribution to the nature of those penalties and forfeitures, and to the services which are to be rendered for their detection and punishment. The act of 1809 (act to interdict commercial intercourse, 2 Story's Laws, 1120, § 18 [2 Stat. 550]), then, adopts the rule of distribution prescribed in the act of 1799. Perhaps the persons favoured by that rule, may be most certainly discerned by looking something further into the nature of the service to be performed by those who, under that act, might claim reward. These penalties are imposed, some for acts of omission, others for acts of commission. In cases of omission, the labour of the officer is not considerable, but is perhaps essential to the security of the revenue. In all of them this attention must be kept alive, in order to observe the conduct of those who are transacting business in the office, and he must be on the alert to take care that all the formalities prescribed by law are observed. If, in any instance, they are neglected, he must take care that measures are pursued which shall enable the United States to convict the offender. Those of commission are very numerous. It would be tedious to recapitulate them, but it may not be improper to mention one or two as examples. If any part of the cargo of a ship bound to the United States, shall be unladen within the limits thereof, without authority, the goods are forfeited, and the master and the mate shall respectively pay $1,000. So, if any person shall assist in such unlading, he forfeits treble the value of the goods and the vessel which shall receive them, if they be put on board a vessel. (Act 1799, §§ 27, 28.)

If a part of these penalties and forfeitures be given to the revenue officers, what are the services it is given to remunerate, and what are the services the reward is intended to stimulate? To discover these frauds, the officers of the revenue must be watchful, they must be on the alert. If they are not, the frauds will be committed, and they will escape punishment. It is detection which saves the law from infraction, and secures the punishment. So, there is a penalty for sailing from a district before entry, or for not making a full entry within a limited time. These penalties are inflicted for the security of the revenue, and they require the attention of the officers to vessels arriving within the district, in order to secure the observance of the law. So, penalties and forfeitures are incurred, if a vessel, sailing from one port to another, does not obtain at the port of departure, certain certificates required by law, and exhibit those certificates at the port of delivery within a limited time after her arrival. It is obvious, that the enforcement of this provision depends entirely on the officers at the time of incurring the penalty, and of its detection. Thus too, baggage is exempted from duty, and certain forms are to be observed by the persons claiming it, but the officer may examine the baggage, and if upon examination any article be found subject to duty, not mentioned by the owner, the article is forfeited, and a penalty of treble the value imposed on the person committing the offence. Again we find the law enforced by the watchfulness and attention of the officer.

It is unnecessary to continue this examination of particular cases. Go through the law, and it will be perceived that the government rests for the security of its revenue on the fidelity and vigilance of those officers who act at the time of the offence, at the time of its detection, and during its prosecution. If we turn from these to the embargo laws, in order to ascertain the motives which induced the legislature to adopt the principle of distribution, prescribed in the act of 1799, we shall derive some aid from looking into other penalties than that incurred by the breach of the bond. Any vessel which sails from a port of the United States without a permit, or which sails to a foreign port, is liable to forfeiture. Any foreign vessel, taking on board any specie or cargo, is liable, with the specie or cargo, to forfeiture, and every person concerned in such unlawful shipment, is liable to a penalty, not less than $1,000, nor more than $20,000. In these, and in many other cases, the most entire reliance is placed on the officers of the revenue, to secure the law from violation by their vigilance; and, certainly, it is reasonable to suppose, that it was the object of the legislature to stimulate this vigilance by rewarding it. If, in the particular case of an embargo bond, there was really no merit in the revenue officers who took and prosecuted the bond, this might be a reason with the legislature for not classing it with cases in which such merit exists, but can furnish no reason to the court for withdrawing it from the influence of those cases. There is not, however, this total destitution of merit which has been insisted on. A degree of skill and attention is requisite in taking the bonds, to avoid the object being defeated as has happened in this court in several cases (Dixon v. U. S. [Case No. 3,934]; U. S. v. Gordon [Id. 15,232]; U. S. v. —— [Id. 14,413]) by the officers' mistaking the proper form in which they should be taken. The vessel and cargo must be valued, the bond must conform to that valuation, and evidence of value must be furnished on the

trial. The taking of the bond is preceded by that vigilance, which is requisite to prevent the vessel from sailing without giving the bond. These considerations might be sufficient to induce the legislature to leave this penalty on the footing of all others, incurred under the different acts of congress, on this subject, and under the duty law.

The court will now pass from the services which it is reasonable to suppose the legislature intended to reward, in order to examine the provisions and phraseology of the law, for further lights on this question, whether services up to the judgment, or subsequent to the judgment, were the objects of this legislative bounty. It is first observable, that the bounty is payable in equal proportions to the collector, naval officer, and surveyor. If the receipt of the money is the fact for which compensation is made, why this distribution? Why are the naval officer and the surveyor put on an equal footing with the collector? They incur no portion of the risk or trouble incurred in receiving and paying away the money, nor do they participate in the commission allowed for collecting duties. If, however, this compensation is intended, not as a reward for collecting the money recovered, but for the vigilance required for the execution of the law, the motives to this distribution are obvious. They are equally sentinels on the port, equally on the conduct of those who are to be watched; and having, on this account, equal claims, are thus prevented from entertaining those reciprocal jealousies which might seduce them to thwart the operations of each other, and, perhaps, impede detection, if the particular informer engrossed the prize. The reward is given, "to such of the said officers as there may be in the said district." As there may be when? Certainly, when the reward is earned. Suppose, after judgment, and before the receipt of the money, one of these officers should be discontinued by law. Would he lose any share of the penalty? Suppose another officer, a naval officer in the district of Petersburg, should be added. Would he be entitled to a share of the penalty? It is admitted, that this is merely stating the question in controversy, but it is stating it in a form which leads, in some measure, to an opinion on it. If the revenue officers, who are the legal sentinels, and whose duty it is to watch, do not detect the offences, the reward is divided between the informer, and the unsuccessful sentinels. Yet the informer has nothing to do with collecting the money. In the case of the officers of the revenue cutter, who are entitled to a moiety of the penalty, if it be recovered on any information given by them, it seems to be admitted, that the officers at the time of discovery, are entitled to claim the reward. This is admitted, because they claim solely in the character of informers. But the words applicable to them, are the same as those applied to the revenue officers, and

not more susceptible of an interpretation, according to the nature of the case. The clause respecting the witness, would, unquestionably, be equally proper, whether the interest of the person called on, be certain or contingent: but there is something in its language, which deserves some, though not much attention. The share, says the law, to which the witness would otherwise be entitled, shall revert to the United States.

The right of the United States, is inchoate, on the commission of the offence, and is consummated by the judgment. The term "revert," which is here used, indicates, that in the mind of the legislature, something was done, in consequence of which, a portion of this right had passed out of the United States, which returned on the fact of calling the person to whom it had passed, as a witness. And the same words are applied to an officer of the revenue, an officer of the revenue cutter, and a common informer. In such case, the share to which the witness would otherwise have been entitled, reverts to the United States. It is more worthy of remark, that the appropriate compensation for receiving money, is a commission on the money received, to be retained by the receiver. The appropriate and usual reward for those who detect offences against the laws, and prosecute them to punishment, is a part of the penalty, and the language and provisions of this section, seem to proceed on that idea. It directs, that "one moiety shall be paid to the United States, by the collector receiving the same; the other shall be divided in equal proportions between the collector and naval officer of the district, and surveyor of the port wherein the same shall have been incurred." If the part of the collector had belonged to him who received the money, he would not be directed to pay it to the collector of the district, but to retain it himself. The language of "payment" and "retainer," are too distinct to be confounded with each other. It is perfectly understood, that this phraseology is to be accounted for, by the fact, that the suit may be prosecuted, and money may be received by the collector of the district, in which the seizure was made, while the beneficial interest is in the revenue officers of the district in which the penalty was incurred. But this does not impair the argument. If the receipt of the money induced the reward, why is it not bestowed on the officer who collects it? Why on the officer who does not, and who has, in law, no right to collect it? It would seem, as if the language and provisions of the law, excluded the idea, that any part of the penalty was intended as a compensation for its collection. The idea that this is a gift bestowed on the office for the purpose of enhancing its emoluments, is not sustained by the general course of legislation on the subject. If the acts respecting the emoluments of the office of collector be examined, it will be found that the legislature has required the collector to show

regularly the amount of the commissions, has reduced the per centage by several successive acts, and has finally directed that the emoluments of office shall not exceed a specific sum. This regulation does not comprehend penalties, but it shows that the share of penalties is not given to the office for the purpose of annexing value to it, but is given to the individual to stimulate and to reward his services in enforcing the execution of the laws.

The counsel for Mr. Jones have, with great force and argument, called on their opponents to say at what time a right to a share of the penalty vests in the individual, and have urged the difficulty of doing this, as a reason for fixing on the moment of distribution as that at which the right vests. This difficulty is not imaginary, but is felt as a real one. In this case, however, the only contest is between those who claim at the time of the judgment, and those who claim after it. There are some reasons, in addition to those which have already been urged, for supposing the judgment to fix ultimately the rights of the parties. The judgment changes entirely the nature of the right. From a claim to a penalty or forfeiture depending on evidence, the right to which is contested, it becomes a positive debt, and the right is vested absolutely in the United States. It would seem reasonable that all rights which were, pending the action, contingent and uncertain, should then, likewise vest in the persons entitled to them. No further proof is requisite, no further vigilance necessary, no further controversy exists, a claim to a penalty is converted into a debt. If collection may be delayed by fraudulent covers of property, it is equally the case in every other debt, and furnishes in no other instance a motive for giving more than a commission. Neither can the idea, that because this is a perpetual office, the officer can be considered as always in being under contemplation of law, as in the case of the king or other sole corporation, avail the plaintiff. The office is not hereditary. It is filled by individuals appointed by the executive, and between the removal of one officer, and the appointment of another, a long interval may elapse. Though the office never dies, the individuals who fill it do, and as their emoluments are considered in the light of compensation for services, the rewards of services rendered by one, ought not to be bestowed on another.

The result of the best consideration which the court has been able to bestow on the subject, is, that the acts, taken altogether, show the intention of the legislature, in giving to its revenue officers a portion of the penalties and forfeitures, inflicted for a violation of the embargo laws, to have been to stimulate those officers to vigilant exertion of duty in detecting offences and prosecuting the offenders to conviction, and that those alone are entitled to those rewards who have performed the service. This intention is sufficiently apparent to give to those words of the distributive section a construction different from that which they most naturally bear, if separated from every other part of the act, and to apply them to those who were officers when the service was performed, not to those who are officers when the distribution is to be made.

NOTE.—So far as the claim of the deceased collector was concerned, it will have been perceived, that although John Shore died a few days before the judgment was rendered, yet, as the duties of the office continued to be discharged by his deputy, until subsequent to its rendition, the court held that John Shore virtually survived the judgment, and that the chief justice relied strongly on that fact as establishing the validity of his claim. This doctrine of constructive survivorship, however, did not apply to the claim of the representative of Forborne, the late surveyor, who died long before the judgment was rendered, and whose successor had been in office many months previous thereto. After the above opinion was delivered, the court being divided on the question, whether the remaining moiety of the penalty (the United States being entitled to the other moiety,) should be paid to the collector then in office, to be by him distributed according to law, as the court should direct, or without any direction on the subject, certified that question to the supreme court. Upon the hearing of the suit in chancery, on the bill, answers, and proof, in which none of the facts were controverted, a question occurred before the court, whether Forborne's representative was entitled, in right of his intestate, to receive the moiety of that portion of the penalty which was, by law, to be distributed among the several revenue officers of the district wherein the penalty was incurred: upon which question the court was divided, and the same question was certified to the supreme court. Mr. Justice Story, in delivering the unanimous opinion of the court, said, "That the right of the collector to forfeitures in rem, attaches on seizure, and to personal penalties on suits brought, and in each case it is ascertained and consummated by the judgment: and it is wholly immaterial whether the collector die before or after judgment. And they are further of opinion, that the case of the surveyor is not, in this respect, distinguishable, in any manner, from that of the collector. We are, therefore, of opinion, that the representatives of the deceased collector and surveyor, and not the present incumbents in office, are entitled to the distributive shares of the moiety of the money now in the registry of the circuit court." The supreme court certified to the circuit court, as their opinion, 1. That in the case of the United States v. Jones et al., the moiety of the money now remaining in the custody of the circuit court, in the proceedings in the case of the United States, appellants, v. Joseph Jones and others, mentioned, should be paid to the said Joseph Jones, collector of the district of Petersburg, to be by him divided, in equal proportions, between Shore's executor and Forborne's administrator. 2. That in the case of Shore's Ex'r v. Jones, the representative of the late surveyor, in right of his intestate, was entitled to receive one moiety of that portion of the penalty in the proceedings mentioned, which is, by law, to be distributed among the several revenue officers of the district wherein the penalty was incurred. See 1 Wheat. [14 U. S.] 462; 3 Pet. Cond. R. 624.